## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

-----------------------------------------------------------x
: 
In re:                                                      :        Chapter 11
                                                            :
ENTEGRA POWER GROUP LLC, *et al.*,                          :        Case No. 14-_____ (    )
                                                            :
                                        Debtors.            :
                                                            :        Joint Administration Requested
                                                            :
-----------------------------------------------------------x

## MICHAEL R. SCHUYLER'S DECLARATION IN SUPPORT
## OF THE DEBTORS' CHAPTER 11 PETITIONS AND FIRST DAY PLEADINGS

I, Michael R. Schuyler, hereby declare under penalty of perjury:

1.      I am the President and CEO of Entegra Power Group LLC ("**Entegra**"), a limited liability company organized under the laws of the State of Delaware, and President and/or CEO of each of the other above-captioned debtors and debtors in possession (collectively, the "**Debtors**" and excluding Entegra, the "**Debtor Subsidiaries**")[1] and have served in such capacity since 2008.  I joined Entegra in 2005 as President and Chief Operating Officer.  I also serve on the Board of Directors of Yellow Jacket Energy, LLC.

2.      Prior to joining Entegra, I was employed by TECO Energy, where I served as Senior Vice President from 2001 to 2005 and Vice President from 1998 to 2001.  During this time I was in charge of business development for TECO Energy's independent power business and I led the startup of TECO EnergySource, which was the business unit that managed the

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are Entegra Power Group LLC (3825); Entegra TC LLC (2889); EPG LLC (8348); Basso TP-2 Inc. (1726); Union Power LLC (N/A); Union Power Partners, L.P. (5385); UPP Finance Co. LLC (7090); Trans-Union Pipeline LLC (N/A); Trans-Union Interstate Pipeline, L.P. (7870); Entegra Power Services LLC (3106); Union Power Employee Company LLC (0841); and Gila River Energy HoldCo LLC (3510).  The address of the Debtors' corporate headquarters is:  100 S. Ashley Dr., Suite 1400, Tampa, FL 33602.

commercial aspects of TECO's independent power assets.  Prior to serving in these roles, I filled a variety of management roles with increasing responsibility throughout the TECO Energy organization.   I hold a Master of Science Degree in Engineering Management from the University of South Florida, which I received in 1990, and a Bachelor of Science Degree in Industrial Engineering from the University of South Florida, which I received in 1984.

3.     Concurrently with the filing of this declaration (the "**Declaration**") on August 4, 2014 (the "**Petition Date**"), the Debtors have filed with this Court voluntary petitions for relief under chapter 11 of the Bankruptcy Code.  The Debtors are also filing concurrently with this Declaration the "Debtors' Joint Prepackaged Plan of Reorganization Under Chapter 11 of the Bankruptcy Code," dated as of July 3, 2014 (as it may be amended, supplemented, restated, or modified from time to time, the "**Plan**"), as well as a disclosure statement for the Plan (as it may be amended, supplemented, restated, or modified from time to time, the "**Disclosure Statement**").   These chapter 11 cases are being commenced following the solicitation of votes on the Plan, which the Debtors seek to have confirmed by the Court.  As of the Petition Date, the Debtors have secured sufficient votes in all classes of claims and equity interests entitled to vote to obtain confirmation of the Plan.

4.     To operate effectively, minimize potential adverse effects of the commencement of these chapter 11 cases, and ease the administrative burden of operating a business in chapter 11, the Debtors have requested certain relief in "first day" applications and motions filed with the Court (collectively, the "**First Day Pleadings**").  I submit this Declaration to assist the Court and any parties in interest in understanding the circumstances that led to the commencement of these chapter 11 cases and in support of the Debtors' chapter 11 petitions for relief and the First Day Pleadings.

5.      Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, my discussions with other members of the Debtors' senior management, my review of relevant documents, or my opinion based upon my experience, knowledge, and information concerning the Debtors' operations and financial condition.  If called upon to testify, I would testify competently to the facts set forth in this Declaration.  I am authorized to submit this Declaration on behalf of the Debtors.

6.      As described below, the Debtors seek by the First Day Pleadings to, among other things:

a)  establish certain administrative procedures to promote a seamless transition into and through these chapter 11 cases;

b)  allow for the continued payment of utility, wage, and tax obligations, all as more fully described below;

c)  ensure the continuation of the Debtors' operations and cash management system without interruption;

d)  use cash collateral in the operation of the Debtors' businesses;

e)  preserve valuable relationships with trade vendors and other creditors whose claims are not impaired by these chapter 11 cases; and

f)  schedule a combined hearing for the Court to consider the adequacy of the Disclosure Statement, approval of the Debtors' prepetition solicitation procedures, and confirmation of the Plan.

7.      I am familiar with the contents of each of the First Day Pleadings, and I believe the Debtors would suffer immediate and irreparable harm absent the ability to continue their business operations as sought in the First Day Pleadings.  In my opinion, approval of the

RLF1 10617357v.1

relief sought in the First Day Pleadings will be critical to the Debtors' efforts to reorganize through these chapter 11 cases efficiently and with minimized disruptions to their business operations, thereby permitting the Debtors to preserve and maximize value for the benefit of all of their stakeholders and successfully emerge from chapter 11.

8.      Part I of this Declaration provides a brief description of the Debtors' businesses, organizational structure, and prepetition indebtedness.    Part II describes the circumstances giving rise to the commencement of these chapter 11 cases.    Part III briefly summarizes the Plan and solicitation process.    Finally, Part IV summarizes the First Day Pleadings.

## I.      DESCRIPTION OF THE DEBTORS

### A.      The Debtors' Businesses

9.      The Debtors operate an independent power company that owns one of the largest gas-fueled power plants in the United States, located in El Dorado, Arkansas (the "**Union Facility**").    In addition, Debtor Gila River Energy Holdco LLC indirectly owns one-half of another of the country's largest gas-fueled power plants, in Gila Bend, Arizona (the "**Gila Facility**" and together with the Union Facility, the "**Facilities**").    The Gila Facility's direct owners are not Debtors in these cases and the Gila Facility will not become property of the Debtors' estates.    The Debtors market electric power from the Facilities to wholesale customers in the southeastern and southwestern United States.

10.      The Union Facility, which is owned and operated by Debtor Union Power Partners, L.P. ("**UPP**"), is a natural gas-fired, combined cycle generating facility consisting of four identical power blocks, located on an approximately 330-acre site in El Dorado, Arkansas. The Debtors have personnel located onsite at the Union Facility that perform management, administrative, and operating maintenance functions.    The Union Facility has historically

4

operated as a merchant facility selling capacity and energy into the Entergy submarket of the Southeastern Reliability Corporation Region, and, more recently into the Midwest Independent System Operator South region.  Capacity and associated energy from one of the Union Facility power blocks will be sold to Entergy Arkansas, Inc. until May 31, 2017.

11.    The Debtors' corporate headquarters and full service asset management group are based in Tampa, Florida.  Debtor Entegra Power Services, LLC ("**EPS**") provides various services for the Union Facility from this location, including, among other things, operating and maintaining the Union Facility, purchasing and replacing spare parts, tools, and equipment, and maintaining financial and operational records.

12.    Debtor Trans-Union Interstate Pipeline, L.P. ("**Trans-Union**") owns and operates a natural gas transmission system known as the Trans-Union Interstate Pipeline (the "**TUIP**").  The TUIP extends from interconnections with Texas Gas Transmission, LLC ("**TGT**"), an interstate natural gas pipeline, and Regency Intrastate Gas System ("**RIG**"), an intrastate pipeline, at or near Sharon, Louisiana, and traverses through Louisiana and Arkansas 41.7 miles to its terminus at its sole delivery point at the Union Facility.  UPP has entered into natural gas transportation contracts with TGT and RIG.

**B.    Formation and Organizational Structure**

13.    The Facilities were built from March 2001 to July 2003, before Entegra's formation.  In 2005, pursuant to a chapter 11 restructuring, the then-equity owner of the Facilities, TECO Energy, Inc., transferred ownership of UPP, Trans-Union, Debtor UPP Finance Co. LLC, and Panda Gila River L.P. (n/k/a Gila River Power LLC, a non-Debtor) to Debtor EPG LLC ("**EPG**"), a company wholly-owned by the Facilities' original debt holders.

14.    In 2007, EPG went through a restructuring and refinancing transaction (the "**2007 Restructuring**"), which created two new holding companies, Entegra and Entegra

TC LLC ("**ETC**"), a wholly owned subsidiary of Entegra.  As a result of the 2007 Restructuring, the former owners of EPG became the direct owners of Entegra, which became the 100% direct owner of ETC, and ETC became the 100% direct owner of EPG.  A chart showing the Debtors' current organizational structure appears as Exhibit A to this Declaration.

15.     Since its formation, Entegra has been governed by its board of directors, largely comprising executives with significant experience in energy marketing, power plant operations, regulatory affairs, finance, and accounting, the majority of them acting at all times independently or as independent directors.

### C.     Prepetition Indebtedness and Capital Structure

16.     As of the Petition Date, the Debtors' long-term debt obligations totaled approximately $1.5 billion, consisting of, among other things, funded debt under the Prepetition Second Lien Credit Agreement and the Prepetition Third Lien Credit Agreement (each as defined below).  The Debtors also incur unsecured debt in the ordinary course of their operations.  The primary components of the Debtors' capital structure are described below.

17.     *Prepetition Second Lien Debt*.  The Debtors are party to that certain Credit Agreement (Second Lien), dated as of March 27, 2014, by and among ETC as borrower, Entegra, U.S. Bank National Association as administrative agent (the "**Prepetition Second Lien Agent**"), the lenders from time to time party thereto, and the subsidiary guarantors thereunder (as amended from time to time, the "**Prepetition Second Lien Credit Agreement**").  The Prepetition Second Lien Credit Agreement provides for a $231 million payment-in-kind term loan that matures on March 27, 2017 (the "**Prepetition Second Lien Debt**").  The proceeds of the Prepetition Second Lien Credit Agreement were used to refinance the Debtors' obligations under that certain Credit Agreement (Second Lien), dated as of August 10, 2011, by and among ETC as borrower, Entegra, Credit Suisse AG, Cayman Islands Branch as administrative agent,

6

the lenders from time to time party thereto (the "**2011 Second Lien Lenders**"), and the subsidiary guarantors thereunder (the "**2011 Second Lien Credit Agreement**"), which was set to mature on March 31, 2014. As of the Petition Date, approximately $236,903,333 (plus accrued but uncapitalized interest) in Prepetition Second Lien Debt remains outstanding. ETC's obligations under the Prepetition Second Lien Credit Agreement are secured by a second-priority lien on substantially all of the Debtors' assets and are guaranteed by Entegra and the Debtor Subsidiaries (excluding Union Power Employee Company LLC). The Debtors currently have no first-priority secured debt;[2] however, the Prepetition Second Lien Credit Agreement permits the Debtors to obtain up to $40 million in revolving credit, secured on a first-priority basis.

18.  *Prepetition Third Lien Debt*. The Debtors are party to that certain Credit Agreement (Third Lien), dated as of April 19, 2007, by and among Entegra as borrower, the subsidiary guarantors thereunder, the lenders from time to time party thereto, Wells Fargo Bank, National Association (as successor-in-interest to Credit Suisse AG, Cayman Islands Branch) as administrative agent (the "**Prepetition Third Lien Agent**"), and the other parties thereto (as amended from time to time, the "**Prepetition Third Lien Credit Agreement**"). As of the Petition Date, the Prepetition Third Lien Credit Agreement has been amended twenty-three times. The fifth through twenty-third amendments provide for temporary waivers of the covenant relating to the Debtors' total indebtedness (discussed in further detail below).[3] The

---

[2] The Debtors were party to that certain Credit Agreement (First Lien), dated as of April 23, 2012, which provided for a $40 million senior secured cash collateralized letter of credit facility. This facility matured on December 15, 2013, and no longer remains outstanding.

[3] First Amendment to Credit Agreement (Third Lien), dated as of November 17, 2010; Second Amendment, Authorization and Consent, dated as of July 8, 2011; Third Amendment to Credit Agreement (Third Lien), dated as of August 10, 2011; Fourth Amendment to Credit Agreement (Third Lien), dated as of February 2, 2012; Fifth Amendment to Credit Agreement (Third Lien), dated as of December 20, 2013; Consent, Waiver and Sixth Amendment to Credit Agreement (Third Lien), dated as of February 28, 2014; Seventh Amendment to Credit Agreement (Third Lien), dated as of March 7, 2014; Eighth Amendment to Credit Agreement (Third Lien), dated as

Prepetition Third Lien Credit Agreement provides for an $850 million payment-in-kind term loan that matures on October 19, 2015 (the "**Prepetition Third Lien Debt**").  As of the Petition Date, approximately $1,312,841,009 (plus accrued but uncapitalized interest) in Prepetition Third Lien Debt remains outstanding.  Entegra's obligations under the Prepetition Third Lien Credit Agreement are secured by a third-priority lien on substantially all of the Debtors' assets and are guaranteed by the Debtor Subsidiaries.

19.    *Other Indebtedness and Long Term Agreements*.  The Debtors also incur unsecured debt in the ordinary course of business.  As of the Petition Date, the Debtors have approximately $2.92 million in prepetition accrued but unpaid unsecured liabilities.  In addition, the Debtors enter into other long-term agreements to support their business functions:

- *Derivatives Instruments and Hedging Activities*.  Because the Debtors' businesses are highly sensitive to fluctuations in the price of energy and related commodities, the Debtors enter into various hedging contracts, including forward contracts, option contracts, and swap agreements, in the ordinary course of business, to minimize exposure to commodity price volatility and to ensure a stable supply of natural gas and stable demand for the power the Debtors produce.  The Debtors have taken the position to not designate energy and natural gas derivatives as hedging instruments, and instead the fair value changes on these derivatives are marked to market and recognized in earnings.  In addition, the Debtors have historically utilized interest-rate swaps to limit the exposure to interest-rate fluctuations on their long-term debt.  Currently, there are no interest-rate swaps outstanding or in effect.  The Debtors use derivatives only to reduce normal operating and market risks, and not for speculative

---

of March 14, 2014; Ninth Amendment to Credit Agreement (Third Lien), dated as of March 21, 2014; Waiver and Tenth Amendment to Credit Agreement (Third Lien) and Consent Agreement, dated as of March 27, 2014; Eleventh Amendment to Credit Agreement (Third Lien), dated as of April 11, 2014; Twelfth Amendment to Credit Agreement (Third Lien), dated as of April 17, 2014; Thirteenth Amendment to Credit Agreement (Third Lien), dated as of April 25, 2014; Fourteenth Amendment to Credit Agreement (Third Lien), dated as of May 2, 2014; Fifteenth Amendment to Credit Agreement (Third Lien), dated as of May 9, 2014; Sixteenth Amendment to Credit Agreement (Third Lien), dated as of May 16, 2014; Seventeenth Amendment to Credit Agreement (Third Lien), dated as of May 23, 2014; Eighteenth Amendment to Credit Agreement (Third Lien), dated as of May 30, 2014; Nineteenth Amendment to Credit Agreement (Third Lien), dated as of June 6, 2014; Twentieth Amendment to Credit Agreement (Third Lien), dated as of June 13, 2014; Twenty-First Amendment to Credit Agreement (Third Lien), dated as of June 27, 2014; Twenty-Second Amendment to Credit Agreement (Third Lien), dated as of July 11, 2014; Twenty-Third Amendment to Credit Agreement (Third Lien), dated as of July 25, 2014.

purposes.  The risk management policies adopted by the Debtors provide a framework through which management monitors and approves various risk exposures.  Daily and periodic reporting of positions and other relevant metrics are performed by a centralized risk management group.

- ***Pratt and Whitney Installment Payments***.  On January 24, 2006, as part of its long-term major maintenance plan, non-Debtor Gila River Power LLC ("**Gila River**") executed a 9-year parts supply and service agreement with Pratt & Whitney Power Services, Inc. ("**PWPS**"), a subsidiary of Pratt & Whitney (the "**Purchase Agreement**").  On August 10, 2011, Gila River, UPP, ETC, and PWPS entered into a Bill of Sale, Assignment and Assumption Agreement, pursuant to which Gila River assigned all of its rights, title and interest, and obligations under the Purchase Agreement to ETC and UPP.  Pursuant to the Purchase Agreement, PWPS provides certain major maintenance part sets to the Facilities over the life of the contract and performs certain maintenance refurbishment activities in exchange for quarterly installment payments of $131,111.12 over the term of the Purchase Agreement.  All components and parts purchased from PWPS, which are located at the Union Facility, have been pledged as collateral to secure the installment payments.  In addition, Gila River has posted a $0.9 million letter of credit facility to secure the installment payments.  As of July 1, 2014, approximately $2.5 million in installment payments remains outstanding.

20.    *Equity Interests*.  Entegra, the ultimate parent entity within the Debtors' organizational structure, is a privately-held company.  As of the Petition Date, Entegra had issued approximately 27,000,000 units of equity interests, held by approximately 38 entities.  Entegra's three largest equity interest holders hold approximately 36% of Entegra's outstanding equity interest units.

## II.    KEY EVENTS LEADING TO COMMENCEMENT OF THE CASES

### A.    Economic Environment

21.    Wholesale electricity prices have fallen significantly in recent history as a result of reduced electricity demand and substantial reductions in natural gas prices.  Lower natural gas prices have been caused, in part, by the rapid expansion of natural gas production, and natural gas inventories arising from the development of new extraction techniques and the discovery of new shale deposits.  Generally, the presence of low-priced natural gas reduces the

variable costs of natural-gas fired power facilities and reduces the wholesale market price for all generators.  Furthermore, the power generation industry is highly competitive on both a regional and national level.  This competitive environment has added an additional layer of complexity to the Debtors' existing challenges.

**B.      Debt Obligations**

22.      As discussed earlier, the Debtors are subject to more than $1.5 billion in funded debt obligations, the majority of which (the Prepetition Third Lien Debt) is scheduled to mature on October 19, 2015.  Due to the current economic environment, among other things, the Debtors have determined that they will be unable to satisfy all of their obligations under the Prepetition Second Lien Credit Agreement and Prepetition Third Lien Credit Agreement.

**C.      Restructuring Negotiations**

23.      Faced with these economic issues, the Debtors negotiated with the 2011 Second Lien Lenders and the Prepetition Third Lien Lenders in an effort to fix their capital structure and position the Debtors for ongoing success in the current economic environment. The Debtors and the 2011 Second Lien Lenders began discussing a potential refinancing of the Debtors' obligations under the 2011 Second Lien Credit Agreement in the spring of 2013. Together, the Debtors and the 2011 Second Lien Lenders considered several proposals to refinance the Debtors' obligations under the 2011 Second Lien Credit Agreement; however, each of these proposals required the consent of the Prepetition Third Lien Lenders.  To this end, in September 2013, the Debtors began discussing the potential refinancing of the Debtors' obligations under the 2011 Second Lien Credit Agreement and a potential restructuring of the Prepetition Third Lien Debt with the Participating Prepetition Third Lien Lenders (as defined in the Plan).  On November 1, 2013, the Debtors engaged Houlihan Lokey Capital, Inc. ("**Houlihan**") to assist the Debtors with these discussions and provide financial advisory and

10

investment banking services in connection with a financial restructuring or reorganization of the Debtors.

24.      In February 2014, Houlihan completed its valuation report of the Debtors and presented the report to the Debtors' board of directors.  Subsequently, the Debtors, the 2011 Second Lien Lenders, and the Participating Prepetition Third Lien Lenders determined that the most efficient path forward would be to refinance the Debtors' obligations under the 2011 Second Lien Credit Agreement prior to filing for chapter 11 relief and restructure the Prepetition Third Lien Debt through a chapter 11 filing.  The Debtors attempted to obtain new senior secured financing from outside lenders but determined that such financing could not be obtained on commercially reasonable terms in advance of the chapter 11 filing.   The Participating Prepetition Third Lien Lenders negotiated better terms with more flexibility, and accordingly, on March 27, 2014, the Debtors entered into the Prepetition Second Lien Credit Agreement, the proceeds of which were used to refinance the Debtors' obligations under the 2011 Second Lien Credit Agreement.  Additionally, during this time, the Debtors engaged in discussions with the holders of the existing equity interests in Entegra regarding the cancellation and discharge of their equity interests.

25.      These negotiations resulted in significant majorities of the Debtors' key stakeholders agreeing to support a restructuring and vote to accept the Plan pursuant to a Restructuring Support Agreement, dated June 27, 2014, among the Debtors and (i) 100% in amount and number of the holders of the Debtors' Prepetition Second Lien Debt; (ii) more than 66⅔% in amount and half in number of the holders of the Debtors' Prepetition Third Lien Debt; and  (iii) holders of approximately 60% in amount of the Debtors' equity interests (the

"**Restructuring Support Agreement**").  The solicitation and proposed restructuring are being made pursuant to the terms agreed upon in the Restructuring Support Agreement.

26.      Because the Debtors anticipated that they would not be in compliance with certain financial covenants under the Prepetition Third Lien Credit Agreement for the period ended December 31, 2013, the Debtors were able to negotiate the Fifth Amendment to Credit Agreement (Third Lien), dated December 20, 2013.   The Fifth Amendment amended Section 8.2.2 of the Prepetition Third Lien Credit Agreement, which requires that the Debtors' total amount of debt not increase beyond certain specified thresholds as of certain dates of determination, by changing the "Applicable Date of Determination" from December 31, 2013, to February 28, 2014.  Subsequently, the Debtors entered into eighteen additional amendments to the Prepetition Third Lien Credit Agreement, which, among other things, further amended Section 8.2.2 of the Prepetition Third Lien Credit Agreement by extending the "Applicable Date of Determination" to August 8, 2014.  In order to remain in compliance with the terms of the Prepetition Third Lien Credit Agreement as amended, the Debtors' total debt must be less than $1.275 billion as of August 8, 2014.

## III.      PROPOSED RESTRUCTURING AND SOLICITATION[4]

27.      The Plan contemplates a comprehensive financial restructuring of the Debtors' capital structure that will reduce the Debtors' leverage and place the Debtors in a stronger financial position for future competitive and strategic initiatives.  Under the Plan, on or about the Effective Date: (i) Holders of Allowed Prepetition Second Lien Claims will receive their Pro Rata Share of (a) the New Second Lien Series A Notes (the aggregate principal amount of which will be equal to the principal amount outstanding under the Prepetition Second Lien

---

[4] Any capitalized term not expressly defined in this Part III has the meaning used in the Plan.

Credit Agreement (approximately $237 million), plus accrued and unwaived interest, minus the amount of the New Second Lien Series B Notes), to be issued pursuant to the New Second Lien Note Indenture and (b) the aggregate amount of Cash received by the Debtors from the proceeds of the New Second Lien Series B Notes; (ii) Holders of Allowed Prepetition Third Lien Claims will receive their Pro Rata Share of (a) 100% of the ETC Senior Equity Interests (subject to the execution and submission of a joinder to the Reorganized ETC LLC Agreement) and (b) $550 million in principal amount of New Third Lien Debt, to be issued pursuant to the New Third Lien Credit Agreement; and (iii) existing Equity Interests in Entegra will be cancelled and Holders of Allowed Equity Interests in Parent will receive their Pro Rata Share of the ETC Series B Equity Interests (subject to the execution and submission of a joinder to the Reorganized ETC LLC Agreement); **provided**, **however**, that Holders of Allowed Equity Interests in Parent who vote to accept the Plan may elect on their voting ballot to waive their right to receive their Pro Rata Share of the ETC Series B Equity Interests.   In addition, eligible Holders of Allowed Prepetition Third Lien Claims will be permitted to purchase New Second Lien Notes in the form of New Second Lien Series B Notes (the eligibility requirements for purchase of the New Second Lien Series B Notes are described in Section 5.4 of the Plan).   Holders of all other Claims and Equity Interests will be Unimpaired.

28.     Prior to the Petition Date, the Debtors began soliciting votes on the Plan by instructing their voting agent, Prime Clerk LLC ("**Prime Clerk**"), to distribute a solicitation package containing the Disclosure Statement, including the Plan and other exhibits thereto, and one or more ballots, as applicable, to each Holder of an Impaired Claim or Equity Interest (*i.e.*, the Prepetition Second Lien Claims, Prepetition Third Lien Claims, and Equity Interests in

Parent).[5]  As of the Petition Date, the Debtors have secured sufficient votes in all Classes entitled to vote to obtain confirmation of the Plan.  Prime Clerk informed the Debtors that 100% of holders of impaired claims and equity interests that submitted ballots voted to accept the Plan.

## IV.     SUMMARY OF THE FIRST DAY PLEADINGS[6]

29.     Concurrently with the filing of these chapter 11 cases, the Debtors have filed the following First Day Pleadings:

a)  Debtors' Motion for Entry of an Order Directing Joint Administration of Chapter 11 Cases ("**Joint Administration Motion**").

b)  Debtors' Motion for Entry of an Order Authorizing the Debtors to File a Consolidated List of Creditors Instead of Submitting a Separate Mailing Matrix for Each Debtor ("**Consolidated Creditor List Motion**").

c)  Debtors' Application for Entry of an Order Authorizing Employment and Retention of Prime Clerk LLC as Claims and Noticing Agent, *Nunc Pro Tunc* to the Petition Date (the "**Prime Clerk Application**").

d)  Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Continued Use of Existing Cash Management System and Bank Accounts; (II) Waiving Certain United States Trustee Requirements; (III) Authorizing Continued Performance of Intercompany Transactions; and (IV) Granting Related Relief ("**Cash Management Motion**").

e)  Debtors' Motion for Entry of Interim and Final Orders (I) Prohibiting Utilities from Altering, Refusing, or Discontinuing Service; (II) Approving the Debtors' Proposed Form of Adequate Assurance of Payment to Utilities; and (III) Establishing Procedures for Resolving Objections to the Debtors' Proposed Form of Adequate Assurance ("**Utilities Motion**").

f)  Debtors' Motion for Entry of Interim and Final Orders Authorizing Payment of Certain Prepetition Taxes and Granting Related Relief ("**Taxes Motion**").

---

[5] I understand from my discussions with the Debtors' advisors that none of the Plan's Impaired Classes are deemed to have rejected the Plan for purposes of the Bankruptcy Code.  Accordingly, the Debtors directed Prime Clerk to solicit votes on the Plan from all Holders of Impaired Claims and Equity Interests, and only Holders of Claims and Equity Interests in the Plan's Unimpaired Classes did not receive a solicitation package.

[6] Any capitalized term not expressly defined in this Part IV has the meaning used in the relevant First Day Pleading.

g) Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Payment of Certain Prepetition Claims in the Ordinary Course of Business; (II) Waiving Causes of Action Arising Under Bankruptcy Code Section 547; and (III) Granting Related Relief ("**Trade Creditors Motion**").

h) Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Pay Certain Employee Compensation and Benefits and (B) Maintain and Continue Such Benefits and Other Employee-Related Programs and (II) Directing Financial Institutions to Honor and Process Checks and Transfers Related Thereto ("**Wages and Benefits Motion**").

i) Debtors' Motion for Entry of an Order (I) Scheduling Combined Hearing on (A) Disclosure Statement, (B) Prepetition Solicitation Procedures, and (C) Confirmation of Prepackaged Plan; (II) Fixing Deadline to Object to Prepackaged Plan and Disclosure Statement; (III) Approving Form and Manner of Notice of Combined Hearing and Objection Deadline; (IV) Conditionally (A) Directing the United States Trustee Not to Convene Creditors' Meeting, (B) Waiving Requirement of Filing Statements of Financial Affairs and Schedules of Assets and Liabilities, and (C) Waiving Requirement of Filing Financial Reports Pursuant to Fed. R. Bankr. P. 2015.3; and (V) Granting Related Relief ("**Scheduling and Confirmation Motion**").

j) Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Use Cash Collateral; (II) Granting Adequate Protection to Prepetition Secured Parties; (III) Scheduling a Final Hearing Pursuant to Fed. R. Bankr. P. 4001(b); and (IV) Granting Related Relief ("**Cash Collateral Motion**").

30.    I have reviewed each of the First Day Pleadings or had their contents explained to me, and I believe that the Debtors would suffer immediate and irreparable harm absent the ability to continue their business operations as sought in the First Day Pleadings. In my opinion, approval of the relief sought in the First Day Pleadings is critical to the Debtors' efforts to reorganize through these chapter 11 cases efficiently and with minimized disruptions to their business operations, thereby permitting the Debtors to preserve and maximize value for the benefit of all stakeholders and successfully emerge from chapter 11 in a stronger financial position for future competitive and strategic initiatives.

31.     Several of the First Day Pleadings request authority to pay prepetition claims.  I am told by the Debtors' advisors that Federal Rule of Bankruptcy Procedure 6003 provides, in relevant part, that the Court shall not consider motions to pay prepetition claims during the first 21 days following the filing of a chapter 11 petition, "except to the extent relief is necessary to avoid immediate and irreparable harm."  In light of this requirement, the Debtors have limited their requests for immediate authority to pay prepetition claims to those circumstances where the failure to pay such claims would cause immediate and irreparable harm to the Debtors and their estates.  Consequently, certain aspects of the relief sought in the First Day Pleadings will be deferred for consideration at a later hearing, as indicated therein.

### A.     Joint Administration Motion

32.     The Debtors seek entry of an order directing joint administration of their chapter 11 cases for procedural purposes only.  Given the integrated nature of the Debtors' operations and the fact that the Debtors have jointly proposed a prepackaged chapter 11 plan, I believe that joint administration of these chapter 11 cases will provide significant administrative convenience without harming the substantive rights of any parties in interest.  Many of the motions, hearings, and orders in these cases, will affect each of the Debtors.  I believe joint administration of the Debtors' cases will eliminate the need for duplicate pleadings, notices, and orders in each of the respective dockets and will save the Court, the Debtors, and any parties in interest substantial time and expense when preparing and filing such documents.  Further, joint administration will protect any parties in interest by ensuring that they will be apprised of the various motions filed with the Court with respect to each of the Debtors' cases.

33.     Moreover, I do not believe joint administration will adversely affect the Debtors' respective constituencies, because the Debtors seek only administrative, not substantive, consolidation of the Debtors' estates.  I believe that any parties in interest will not be

16

harmed by the requested relief, but, instead, will benefit from the cost reductions associated with joint administration.

### B.    Consolidated Creditor List Motion

34.    The Debtors seek entry of an order authorizing the filing of a consolidated list of creditors instead of submitting a separate mailing matrix for each Debtor.  I believe that permitting the Debtors to maintain a single consolidated list of creditors, instead of filing a separate creditor matrix for each Debtor, is warranted here.  Requiring the Debtors to segregate and convert their computerized records to a Debtor-specific creditor matrix format would be an unnecessarily burdensome task and would result in duplicate mailings.  Moreover, I understand that the requirement that each Debtor maintain a separate creditor matrix was implemented to provide parties with information they might need if a case is converted to a chapter 7 liquidation. Because these are prepackaged chapter 11 cases where general unsecured claims are unimpaired under the Plan, I do not believe that this concern is implicated here or that any parties in interest will be prejudiced or otherwise materially impacted.

### C.    Prime Clerk Application

35.    The Debtors seek entry of an order authorizing the employment and retention of Prime Clerk as the Claims and Noticing Agent in the Debtors' chapter 11 cases, effective *nunc pro tunc* to the Petition Date.  The Debtors have obtained and reviewed engagement proposals from four court-approved claims and noticing agents to ensure selection through a competitive process.  Based on all engagement proposals obtained and reviewed, the Debtors determined that Prime Clerk's rates are competitive and reasonable given Prime Clerk's quality of services and expertise.

36.    The Debtors anticipate that there will be approximately 1,000 entities that will have to be provided notice in these chapter 11 cases.  In view of the number of anticipated

17

notice parties and the complexity of the Debtors' businesses, I believe that appointment of Prime

Clerk is both necessary and in the best interests of the Debtors' estates and creditors because the

Debtors will be relieved of the burdens associated with claims and noticing services.

Accordingly, the Debtors will be able to devote their full attention and resources to maximize

value for their stakeholders and facilitate the orderly administration of these chapter 11 cases.

37.    Pursuant to the Debtors' request, Prime Clerk has agreed to serve in its

capacity as Claims and Noticing Agent from the Petition Date with assurances that the Debtors

would seek approval of its employment and retention, effective *nunc pro tunc* to the Petition

Date, so that Prime Clerk may be compensated for its pre-application services. I believe that no

parties in interest will be prejudiced by the granting of the *nunc pro tunc* employment, because

Prime Clerk will provide valuable services to the Debtors' estates in the interim period.

### D.    Cash Management Motion

38.    The Debtors seek entry of interim and final orders (i) authorizing the

continued use of the existing Cash Management System; (ii) waiving certain United States

Trustee requirements; (iii) authorizing the use of existing deposit practices under the Cash

Management System; (iv) extending time to comply with Bankruptcy Code section 345(b); and

(v) authorizing the continued performance of Intercompany Transactions consistent with

historical practice and grant of administrative expense priority to Intercompany Transactions. As

part of the relief requested, and to ensure a smooth chapter 11 transition, the Debtors also seek

authority to, among other things, (a) maintain and continue to use their bank accounts in the

same manner and with the same account numbers, styles, and document forms as are currently

employed; (b) deposit funds in, and withdraw funds from, the bank accounts by all usual means;

(c) pay prepetition and ordinary course bank fees in connection with the bank accounts;

(d) perform their obligations under the documents and agreements governing the bank accounts;

18

and (e) treat the bank accounts for all purposes as accounts of the Debtors in their capacities as debtors in possession, and deeming the bank accounts to be "debtor in possession" accounts ("**DIP Accounts**").  The Debtors further request that they be authorized to implement reasonable changes to the Cash Management System as the Debtors may deem necessary or appropriate, including, without limitation, closing any of the bank accounts whenever the Debtors deem that it is necessary or appropriate.  The Debtors request the foregoing in accordance with the terms of the Depository Agreement (as if no Event of Default has occurred or is continuing) and other account control agreements.

39.    To continue the efficient operation of the Cash Management System during the pendency of these cases, the Debtors also request that the banks at which the Debtors hold accounts be authorized and directed to (i) continue to administer, service, and maintain the bank accounts and to receive, process, honor, and pay any and all checks, drafts, wires, ACH transfers, electronic fund transfers, or other items presented, issued, or drawn on the bank accounts (collectively, the "**Disbursements**"); (ii) accept and honor all representations from the Debtors as to which Disbursements should be honored or dishonored; and (iii) honor the Debtors' requests to close any bank account(s).  To the extent that the Debtors direct that any Disbursement be dishonored or the banks inadvertently dishonor any Disbursements, the Debtors request authority to issue replacement Disbursements consistent with the orders of this Court. The Debtors further request that the orders approving the Cash Management Motion specify that no bank will be liable to the Debtors or their estates, or otherwise be held in violation of the orders, for honoring any Disbursement at the Debtors' direction.

40.    The Debtors use a Cash Management System that is similar to those utilized by other large companies to efficiently collect, transfer, and disburse funds the Debtors'

business operations generate.  The Cash Management System facilitates the Debtors' cash monitoring, forecasting, and reporting, and enables the Debtors to maintain control over the administration of their bank accounts.  The Debtors accurately record all collections, transfers, and Disbursements made through the Cash Management System as they are made.

41.    The majority of the Debtors' bank accounts comprising the Cash Management System are located at Citibank N.A. ("**Citibank**") and Bank of America, N.A. ("**Bank of America**").  The accounts at Citibank are maintained pursuant to the Seventh Amended and Restated Depositary Agreement, dated as of April 23, 2012 (as may be amended, supplemented or otherwise modified from time to time, the "**Depositary Agreement**").  I understand that all of the Debtors' bank accounts (other than the petty cash account, described below) are part of the collateral under the Prepetition Second Lien Credit Agreement and Prepetition Third Lien Credit Agreement and are subject to the Depositary Agreement and account control agreements.  As such, I understand that pursuant to these agreements, after an Event of Default (as defined in the Depositary Agreement), the respective collateral agents may exercise control over these accounts.  The Debtors' Cash Management System and cash activity consist of four main categories: (i) revenue accounts and cash receipts; (ii) funding accounts; (iii) operating and payroll accounts and disbursements; and (iv) other accounts and cash uses.

42.    _Revenue Accounts and Cash Receipts_.  The Debtors maintain a master revenue account at Citibank in the name of ETC (the "**Citibank Revenue Account**"), which funds the Debtors' Funding Accounts (described in greater detail below).  All Project Revenues (as defined in the Depositary Agreement) are deposited in the Citibank Revenue Account.

43.    The Debtors generate the majority of their revenue from owning and operating natural gas-fueled power plants and marketing electric power from these plants to

wholesale customers. Since the Debtors' businesses are highly sensitive to fluctuations in the price of energy-related commodities, the Debtors enter into various hedging contracts with counterparties in the ordinary course of business to ensure a stable supply of natural gas and stable demand for the power the Debtors produce. Customers and counterparties are invoiced after all deals are entered and reviewed for accuracy at the end of each month. All payments, depending on the type of payment or contractual agreement in place, are due at various times by the end of the following month. The majority of the cash receipts generated from the Debtors' business operations are received via wire transfer directly into the Citibank Revenue Account. The dollar amount of physical checks received monthly is generally under $200,000. The Citibank Revenue Account also includes funds from rebates and adjustments from vendors, the occasional sale of spare parts, and other miscellaneous income.

44. At the end of each business day, funds in the Citibank Revenue Account are swept into an interest-earning Fidelity investment account held at Citibank (the "**Fidelity Investment Account**") and the balance in the Citibank Revenue Account is reduced to zero. As of July 31, 2014, after sweeping the funds into the Fidelity Investment Account, the balance therein was $5,477,713.22, reducing the balance in the Citibank Revenue Account to zero.

45. The Debtors also periodically receive revenue consisting of insurance proceeds and eminent domain proceeds, which are deposited directly into a separate "Loss Proceeds Account." This account is also maintained at Citibank pursuant to the Depositary Agreement.

46. *Funding Accounts*. The Debtors maintain a funding account at Bank of America (the "**Funding Accounts**") for each of EPS and UPP. Weekly draws amounting to the anticipated weekly operating expenditures for the Union Facility are made from the Citibank

Revenue Account and transferred into the UPP Funding Account.  As further described below, these funds are then transferred into a disbursement account in order to pay invoices at the Union Facility.  The Citibank Revenue Account also funds the EPS Funding Account.  The amounts transferred into the EPS Funding Account are based on the anticipated operating expenditures at EPS as well as the Debtors' payroll obligations.  Again, as further described below, these funds are then transferred into disbursement accounts in order to pay invoices at the Debtors' corporate headquarters and fund payroll.

47.    In order to transfer funds into the Funding Accounts, a withdrawal certificate is sent to Citibank with a request to transfer funds to the relevant Funding Account from the Citibank Revenue Account.[7]  As of the Petition Date, there are no withdrawal certificates that had been sent to Citibank for transfers to the Funding Accounts that had not been presented for clearing.  As of July 31, 2014, the balance in the UPP Funding Account was $204,096.71 and the balance in the EPS Funding Account was $894,011.43.

48.    *The Debtors' Operating and Payroll Accounts and Disbursements*.  The immediate source of operating and payroll expenditures are four operating and payroll accounts maintained at Bank of America (collectively, the "**Disbursement Accounts**").    The Disbursement Accounts are funded by the Funding Accounts on an as-needed basis and do not carry any long-term balances.

49.    Funds are transferred from the Funding Accounts to an operating account for each of EPS and UPP at Bank of America (the "**Operating Accounts**") on an as-needed basis to pay individual invoices at the Union Facility and the Debtors' corporate headquarters.

---

[7] As discussed earlier, the funds are swept from the Citibank Revenue Account at the end of each business day to the interest-earning Fidelity Investment Account.  When Citibank receives a withdrawal certificate, it will transfer the requested funds from the Fidelity Investment Account back to the Citibank Revenue Account and then transfer the funds to the relevant Funding Account.

Payments to vendors and other service providers as well as for the operation and non-major maintenance of the Union Facility are also disbursed from the Operating Accounts (with the exception of payments for gas procurement, discussed below).  I understand that these payments are generally made by wire transfer on a weekly basis.

50.    To fund their payroll, the Debtors transfer funds from the EPS Funding Account to a payroll account for each of EPS and Union Power Employee Company ("**UPEC**"), at Bank of America (the "**Payroll Accounts**") on a biweekly basis based on a monthly estimate of payroll for the following payroll cycle.  Thereafter, Employers Alliance LLC d/b/a Fortune Business Solutions ("**FBS**") automatically direct debits the exact amounts for employee payroll, based on employees' time sheets, from the Payroll Accounts.  FBS transfers the amounts into its own account and distributes payments to the Debtors' employees either through a direct deposit or by issuing a check.

51.    *Other Accounts and Cash Uses*.  The Debtors also maintain several disbursement accounts at Citibank pursuant to the Depositary Agreement that are funded by the Citibank Reserve Account.  A "Major Maintenance Reserve Account" holds an estimate of the Debtors' major maintenance expenses for the ensuing six quarters.  An "Operating Reserve Account" can hold up to $30 million and is drawn on as needed for working capital purposes pursuant to the terms of the Prepetition Second Lien Credit Agreement and the Prepetition Third Lien Credit Agreement.  A "Debt Service Reserve Account" contains funds earmarked for the cash collateralization and payment of reimbursement obligations, interest thereon, fees, and any other obligations arising or coming due.  Amounts due for the purchase of natural gas are wired directly from the Citibank Revenue Account to the applicable counterparty.

52.     I understand that the Debtors also maintain a petty cash account at First Financial Bank in El Dorado, Arkansas (also funded from the Citibank Revenue Account) for UPP's use.  The account has a maximum balance of $5,000 and UPP provides copies of charges before the account is replenished, which generally occurs about once a month.   As of July 31, 2014, the balance in this account is approximately $5,000.

53.     Finally, the Debtors maintain a corporate credit card account at Bank of America for each of EPS and UPP, which is used for small ad-hoc purchases in lieu of a petty cash system.  The monthly balance on each account is generally between $5,000 and $10,000. As of the Petition Date, the combined unpaid balance on the corporate credit card accounts is approximately $13,000.

54.     _Safety and Soundness of the Debtors' Bank Accounts._  All of the Debtors' bank accounts, with the exception of the Fidelity Investment Account, are insured by the Federal Deposit Insurance Corporation ("**FDIC**").

55.     _Transfers of Funds._  In the ordinary course of business, the Debtors utilize various methods to transfer funds to conduct business, including through the use of electronic wire transfers, checks, drafts, ACH transfers, or other items presented, issued, or drawn on the Debtors' bank accounts.

56.     _Bank Fees._  The Debtors pay, honor or allow the deduction from the appropriate bank accounts, certain services charges, and other fees, costs, and expenses that arise in the ordinary course of business (collectively, the "**Bank Fees**").  During 2013, the Debtors estimate that they paid approximately $2,800 in Bank Fees on average each month.  The Debtors estimate that there are approximately $9,000 in prepetition Bank Fees outstanding as of the

Petition Date (collectively, with any other prepetition Bank Fees for prepetition transactions that are charged postpetition, the "**Prepetition Bank Fees**").

57.     *Intercompany Transactions*.    At any given time there may be intercompany claims owing by one Debtor to another, as a result of business transactions and cash flows among the Debtors.  The Debtors track all fund transfers in their accounting system and can ascertain, trace, and account for all intercompany transactions (the "**Intercompany Transactions**").    All intercompany debt claims are secured as part of the collateral and subordinated to the Prepetition Second Lien Credit Agreement and the Prepetition Third Lien Credit Agreement pursuant to the Subordinated Intercompany Note dated April 23, 2012, by and among Entegra, ETC, and each of the subsidiaries of Entegra.   Under the current system, the Debtors are able to track and segregate postpetition intercompany transfers.  For the avoidance of doubt, the Debtors are not currently seeking authority to make intercompany transfers to any non-Debtor affiliates or subsidiaries.

58.     Continued use of the existing Cash Management System will facilitate the Debtors' chapter 11 cases by, among other things, avoiding administrative inefficiencies and expenses associated with disrupting this system and minimizing delays in the payment of postpetition obligations.  I do not believe that any parties in interest will be harmed by the maintenance of the existing Cash Management System because the Debtors employ appropriate mechanisms and internal control procedures to prevent unauthorized payments on account of obligations incurred before the Petition Date.

59.     The Debtors' ability to transfer funds, pay Prepetition Bank Fees, and continue to perform Intercompany Transactions are essential to the Cash Management System.  As the Debtors conduct many of their business transactions through electronic wire transfers and

other similar methods, if the ability to conduct transactions by debit, wire, ACH transfer, or other similar methods is impaired, the Debtors may be unable to perform under certain contracts, their business operations may be unnecessarily disrupted, and their estates will incur additional and unnecessary costs.  Similarly, I believe that the Debtors' inability to pay the Prepetition Bank Fees or to continue to pay the Bank Fees in the ordinary course of business postpetition could hinder their ability to manage their Cash Management System, which would harm the Debtors' estates.  Additionally, as discussed above, the Intercompany Transactions are made between and among the Debtors in the ordinary course as part of the Cash Management System.  If the Intercompany Transactions were to be discontinued, I believe that the Cash Management System and the Debtors' operations would be unnecessarily disrupted, to the detriment of the Debtors and their estates.  The Debtors will continue to track all fund transfers in their accounting system and can ascertain, trace, and account for all such transactions

60.     _U.S. Trustee Requirements_.  I understand from the Debtors' advisors that the U.S. Trustee has established certain guidelines that, among other things, require a debtor in possession to (i) open new bank accounts that are designated as DIP Accounts, with separate DIP Accounts established for an operating account, a tax account, and a payroll account; (ii) obtain and utilize new checks for all DIP Accounts that bear the designation "Debtor In Possession" and contain other information about the debtor's chapter 11 case; and (iii) deposit to the tax DIP Account sufficient funds to pay any tax liability (when incurred) associated with the debtor's payroll (collectively, the "**UST Requirements**").

61.     Given that the Debtors' businesses and financial affairs require the collection, disbursement, and movement of funds through numerous bank accounts, enforcement of these guidelines during these chapter 11 cases would severely disrupt the Debtors' operations.

The Debtors seek a waiver of the UST Requirement to establish specific DIP Accounts for payroll and tax payments and to deposit into specific tax accounts sufficient funds to pay any payroll tax liability (when incurred).  I believe that the Debtors' obligations with respect to payroll and tax payments are most efficiently met through their existing bank accounts in accordance with their existing practices, and that requiring the establishment of new payroll and tax DIP Accounts would be both unnecessary and highly disruptive to their businesses.  The Debtors are current on all payroll tax obligations and anticipate that they will remain current on such obligations.  Further, the Debtors will ensure that the U.S. Trustee can appropriately monitor that the Debtors' payroll taxes are being satisfied in the ordinary course.

62.    Further, to minimize expense to the Debtors' estates, the Debtors also seek authority to continue using all checks, substantially in the forms existing immediately prior to the Petition Date without reference to the Debtors' status as debtors in possession.[8]  The Debtors also seek authority to use all correspondence and other business forms, including, but not limited to, purchase orders, multicopy checks, letterhead, envelopes, promotional materials, and other business forms, substantially in the forms existing immediately before the Petition Date without reference to the Debtors' status as debtors in possession.  As a result of the publicity of these cases, most parties doing business with the Debtors undoubtedly will be aware of the Debtors' status as debtors in possession.  Moreover, the Debtors will provide notice of the commencement of these cases to creditors and any parties in interest.  Changing the Debtors' existing checks, correspondence, and other business forms would be expensive, unnecessary, and burdensome to

---

[8] The Debtors will, however, begin printing the "Debtor in Possession" legend and corresponding bankruptcy case number on all checks within ten (10) days of the date of entry of an interim order.

the Debtors' estates.  Further, such changes would be disruptive to the Debtors' business operations and would not confer any benefit upon those dealing with the Debtors.

63.    *Section 345(b) Requirements.* I understand from the Debtors' advisors that Bankruptcy Code section 345(b) requires that a debtor's estate obtain from an entity with which money is deposited a bond in favor of the United States and secured by the undertaking of an adequate corporate surety or that the estate may require the banking entity to deposit governmental securities in lieu of a surety bond.  Considering the Debtors' limited liquidity and need to conserve cash, the Debtors submit that it would be an unnecessary drain of scarce resources to incur administrative expense at this time to comply with the requirements of Bankruptcy Code section 345(b).  As noted above, each of the Debtors' bank accounts, with the exception of the Fidelity Investment Account, are insured by the FDIC.  I believe the benefits of extending the Debtors' time to comply with Bankruptcy Code section 345(b), to the extent that the balances in the Debtors' accounts exceed FDIC insurance limits at a given time, by sixty (60) days (or such further time as the U.S. Trustee may agree to) will outweigh any harm to the Debtors' estates.

64.    During the extension period, the Debtors will contact each bank that is a party to a Uniform Depository agreement with the U.S. Trustee, provide such banks with each of the Debtors' tax identification numbers, and identify each of their bank accounts at the banks as being held by a debtor in possession.  For banks that are not party to a Uniform Depository agreement with the U.S. Trustee, the Debtors will use good-faith efforts to cause the banks to execute a Uniform Depository agreement in a form prescribed by the U.S. Trustee.  The Debtors' deposits and investments are prudent and designed to yield the maximum reasonable net return on the funds deposited or invested, taking into account the safety of such deposits and

investments.  The Debtors operate sophisticated businesses that are highly regulated at the federal, state, and local levels, and the Debtors hold their funds at reputable, stable banking institutions and monitor their cash flows and positions on a daily basis.  Requiring the Debtors to modify their Cash Management System to strictly adhere with the deadline to comply with the requirements established by Bankruptcy Code section 345(b) will only distract the Debtors' management and cause the Debtors' estates to incur potentially substantial costs unnecessarily to the detriment of all creditors.

### E.    Utilities Motion

65.    The Debtors seek entry of interim and final orders (i) prohibiting Utility Companies from altering, refusing, or discontinuing services, or discriminating against the Debtors on the basis of the commencement of the Debtors' chapter 11 cases, a debt owed by the Debtors for prepetition services, or on account of any perceived inadequacy of the Debtors' proposed adequate assurance procedures; (ii) approving the Debtors' proposed adequate assurance of payment to Utility Companies for postpetition services; and (iii) approving procedures for resolving objections to the Debtors' proposed adequate assurance.

66.    The Debtors buy electricity, water, waste disposal, telephone and internet services, including mobile phone services, and other similar services (collectively, the "**Utility Services**") from Utility Companies in order to operate their businesses.  The Debtors have had a very good payment history with their Utility Companies.  Generally, payments for Utility Services are made in arrears.  To the best of my knowledge, there are few, if any, material defaults or arrearages with respect to the Debtors' undisputed invoices for Utility Services, other than payment interruptions that may be caused by the commencement of these chapter 11 cases.  Over the past 12 months, the Debtors have paid an average of approximately $182,500 per month for Utility Services.  The Debtors estimate that their cost for Utility Services during the 21

days following the Petition Date (not including any deposits to be paid) will be approximately $128,000. To the best of my knowledge, only one of the Utility Companies, Entergy, already holds deposits totaling approximately $128,000.

67. I anticipate that the Debtors will have sufficient cash on hand to timely pay in full, in cash, all undisputed postpetition obligations owed to the Utility Companies during these chapter 11 cases. Nevertheless, within 30 days after the Petition Date, the Debtors propose to provide additional assurance of payment to each Utility Company listed on the Utility Services List for postpetition Utility Services, subject to the limitations in the Cash Collateral Order and any budgets approved in connection therewith. The Debtors propose to place a cash deposit equal to one-half of the Debtors' approximate monthly payment for all Utility Services (the "**Utility Deposit**"), calculated based on the Debtors' historical average expenses over the past 12 months, into a newly-created, interest-bearing segregated account (the "**Utility Deposit Account**") for the benefit of any Utility Company, unless such Utility Company already holds a deposit equal to or greater than one-half of the approximate monthly cost of Utility Services from such Utility Company. The Utility Deposit Account will be held in escrow pending further order of the Court and the Debtors' creditors shall have no interest in, or lien on, any Utility Deposit or the Utility Deposit Account. The Debtors estimate, based on the average Utility Services monthly cost and the amounts already held by Utility Companies in the form of deposits, that the aggregate Utility Deposit will be approximately $7,800.

68. Based on my discussions with the Debtors' advisors, I believe that the Utility Deposit, together with the Debtors' ability to pay for postpetition Utility Services in the ordinary course of business (collectively, the "**Proposed Adequate Assurance**"), constitutes adequate assurance to the Utility Companies for purposes of Bankruptcy Code section 366.

Further, where the Debtors have already provided a Utility Company with a deposit equal to or greater than one-half of the approximate monthly cost of Utility Services from such Utility Company, the Debtors submit that such Utility Company should be deemed to have been provided with adequate assurance of payment as required by Bankruptcy Code section 366.

69.     I do not believe that other or further assurance of payment to Utility Companies for postpetition Utility Services beyond the Proposed Adequate Assurance is necessary, however, if a Utility Company believes that additional or alternative assurance of payment is necessary, the Debtors have proposed procedures to resolve requests for additional or alternative assurance of payment in an orderly and fair manner (the "**Adequate Assurance Procedures**").

70.     The Debtors require continued and uninterrupted Utility Services to operate their businesses during these cases.  Termination of the Utility Services could seriously hamper the Debtors' power generation capabilities.  I believe that the Proposed Adequate Assurance satisfies the requirements of Bankruptcy Code section 366 in that it adequately assures the Utility Companies against any risk of nonpayment for future services.  Further, the Adequate Assurance Procedures are reasonable and appropriate, as they provide the Utilities Companies with a fair and orderly process for determining adequate assurance of payment, while protecting the Debtors from being forced to address numerous requests for additional or alternative adequate assurance in a disorganized manner.  I believe that the Utility Companies and any parties in interest will not be prejudiced by the requirement that Utility Companies provide the Debtors with uninterrupted service, the Proposed Adequate Assurance, or the Adequate Assurance Procedures.

F.      **Taxes Motion**

71.     The Debtors seek entry of interim and final orders authorizing payment in full, in cash, subject to the limitations in the Cash Collateral Order and any budgets approved in connection therewith, of prepetition sales, use, income, and property taxes, and annual report fees, regulatory fees, and all other similar obligations, including any penalties and interest with respect thereto (collectively, the "**Prepetition Taxes**").  The Debtors incur various tax liabilities and fees and in the past have generally paid such tax liabilities and fees to the relevant Taxing Authority as they have become due in the ordinary course of business.  To the best of my knowledge, the Debtors have paid all Prepetition Taxes, not otherwise subject to dispute, that were due and payable prior to the Petition Date.  Certain Prepetition Taxes, however, will become due and payable during these cases.  The Debtors estimate that approximately $1,700,000 in Prepetition Taxes will become due and payable following the Petition Date, of which $1,200,000 will become due and payable within the first 21 days of these cases.  In furtherance of the foregoing, the Debtors also request that this Court authorize and direct all applicable financial institutions to receive, process, honor, and pay all checks or wire transfer requests relating to the Prepetition Taxes.

72.     *Sales and Use Taxes*.  During the ordinary course of business, the Debtors pay sales taxes when they purchase natural gas used to fuel the Union Facility.  At month-end, the sales taxes for the month are calculated based on the amount of gas consumed and the price of gas during that month.  The Debtors also occasionally incur use taxes when they purchase materials and services from a vendor who is not registered to collect sales taxes for the state in which the property is delivered or the services are provided.  In this circumstance, such vendors are not obligated to charge or remit sales taxes.  However, I understand that the Debtors, as purchasers, must self-assess and pay the use taxes, when applicable, to the appropriate Taxing

Authority.  The Debtors estimate that, as of the Petition Date, they have accrued but not yet paid approximately $928,000 in prepetition sales and use taxes.

73.     *Property Taxes*.  Where the Debtors have operations and real and personal property, the Debtors are subject to property tax levies by state and local governments.  The Debtors estimate that, as of the Petition Date, they have accrued but not yet paid approximately $396,000 in property taxes.

74.     *Income Taxes*.  The Debtors pay certain state taxes based on their income during the year.[9]  The Debtors estimate that as of the Petition Date, there will be no accrued and unpaid income taxes.

75.     *Annual Report Fees, Regulatory Fees, and Other Taxes and Fees*. Various Taxing Authorities require the Debtors to pay annual report fees in order to be in good standing for purposes of conducting business within a state.  In addition, the Federal Energy Regulatory Commission annually assesses regulatory fees.  The Debtors also pay certain other taxes and fees in the ordinary course of business, such as franchise fees to operate or otherwise do business in an applicable taxing jurisdiction, and fees for registered agents and various permit fees.  The Debtors estimate that as of the Petition Date, they have accrued but not yet paid approximately $91,000 in annual report fees, regulatory fees, and other taxes and fees.

76.     I believe that the Debtors' ability to pay Prepetition Taxes is critical to their continued and uninterrupted operations and will ultimately preserve the resources of the Debtors' estates and going-concern values.  If the Debtors do not make timely payments, they will be required to spend time and money to resolve a multitude of issues related to these obligations, including whether (i) the obligations are priority, secured, or unsecured in nature;

---

[9] Because they have operated at a loss, the Debtors have not paid, and do not anticipate paying during these chapter 11 cases, federal income taxes.

(ii) they are proratable or fully prepetition or postpetition; and (iii) penalties, interest, attorneys' fees, and costs can continue to accrue on a postpetition basis, and if so, whether the penalties, interest, attorneys' fees, and costs are priority, secured, or unsecured in nature.

77.    Additionally, many federal, state, and local statutes impose personal liability on officers and directors of companies for certain Prepetition Taxes owed by such entities.  To the extent that the relevant Prepetition Taxes remain unpaid, the Debtors' directors, officers, and executives may be subject to lawsuits or criminal prosecution during the pendency of these chapter 11 cases.  Any such lawsuit or criminal prosecution (and the ensuing potential liability) would distract the Debtors and their officers, directors, and executives from devoting their full attention to the Debtors' businesses and the orderly administration of these chapter 11 cases.  The Debtors justifiably want to avoid these unnecessary potential disputes.  I believe any actions on account of such claims, and any ensuing liability, would materially and adversely affect the Debtors' ability to operate in the ordinary course of business and to administer these chapter 11 cases, to the detriment of any parties in interest.

### G.    Trade Creditors Motion

78.    The Debtors seek entry of (a) an interim order (i) authorizing the payment in full, in cash, subject to the limitations in the Cash Collateral Order and any budgets approved in connection therewith, of the liquidated, noncontingent, and undisputed prepetition claims (the "**Payable Claims**") of third-party creditors who will be treated as unimpaired for purposes of the Plan, including, without limitation, trade vendors, common carriers, service providers, and gas suppliers (collectively, the "**Prepetition Creditors**"), as they come due in the ordinary course of business and (ii) granting related relief and entry of (b) a final order (i) authorizing the payment in full, in cash, subject to the limitations in the Cash Collateral Order and any budgets approved in connection therewith, of the Payable Claims of Prepetition Creditors, as they come due in the

34

ordinary course of business; (ii) waiving any and all causes of action arising under Bankruptcy Code section 547 against Prepetition Creditors for payments made in the 90 days prior to the Petition Date (the "**Preference Actions**"); and (iii) granting related relief.  In furtherance of the foregoing, the Debtors also request that the Court (x) authorize and direct all applicable financial institutions to receive, process, honor, and pay any and all checks or wire transfer requests relating to the Payable Claims and (y) schedule a hearing in connection with confirmation of the Plan to consider the relief requested in the Trade Creditors Motion on a final basis.

79.     The Debtors also request that the interim and final orders authorize the payment of the Payable Claims, and, with respect to the final order only, waiver of the Preference Actions, on the condition that, by accepting payment, the Prepetition Creditor agrees to:  (i) maintain or reinstate trade terms during the pendency of these chapter 11 cases that are at least as favorable as those existing on the Petition Date or (ii) maintain such other terms satisfactory to the Debtors in their business judgment.  The Debtors also propose that if a Prepetition Creditor, after receiving a payment on account of its Payable Claim, does not maintain or reinstate trade terms at least as favorable as those existing on the Petition Date during the pendency of these chapter 11 cases, or does not maintain such other terms agreed to by the Debtors, then (a) any payments of Payable Claims made to such Prepetition Creditor after the Petition Date may be, in the Debtors' discretion, either (x) deemed applied to postpetition amounts payable to such Prepetition Creditor or (y) treated as an unauthorized postpetition transfer recoverable by the Debtors under Bankruptcy Code section 549 (or other applicable law) and (b) with respect to the final order only, the waiver of any Preference Actions against such Prepetition Creditor will be null and void in all respects.

80.     In the ordinary course of business, the Debtors incur numerous obligations to various creditors that provide the Debtors with a variety of parts, resources, and services that are necessary for the continued operation of the Debtors' businesses.  The Debtors estimate that, as of the Petition Date, they owe approximately $3 million in Payable Claims,[10] which will become due and payable within the first 21 days of these cases.  The Debtors seek authority to pay in full, in cash, the Payable Claims as they become due in the ordinary course of business in an aggregate amount not to exceed $3 million.

81.     The Debtors operate their businesses in a highly regulated industry that requires them to maintain and develop relationships with certain unique or essential vendors who supply important resources and services to the Debtors.   Any damage to the Debtors' relationships with the Prepetition Creditors will be greatly detrimental to the Debtors' businesses.  The Debtors believe that the Prepetition Creditors may be unwilling or unable to continue doing business with the Debtors unless the Court grants the relief requested in the Trade Creditors Motion, allowing the Payable Claims to be paid and authorizing the Debtors to release the Prepetition Creditors from potential preference exposure.  I believe that authorization to pay the Payable Claims in the ordinary course of business and waive the Preference Actions is necessary to minimize disruption to the Debtors' operations and ensure and a seamless transition through these chapter 11 cases for the benefit of all parties in interest.

82.     Moreover, the Debtors have received unanimous acceptance for the Plan from each of the impaired classes of claims and equity interests under the Plan.  The Plan provides, among other things, that all causes of action under chapter 5 of the Bankruptcy Code,

---

[10] For the avoidance of doubt, the scope of the Trade Creditor Motion and the relief requested therein does not apply to any prepetition claim for which the Debtors seek authority to pay pursuant to a separate First Day Pleading filed by the Debtors; for purposes of the Trade Creditor Motion, such claims shall not be considered "Payable Claims" and the holders of such claims shall not be considered "Prepetition Creditors."

including the Preference Actions, will be released by the Debtors upon the effective date of the Plan. In light of the overwhelming support for the Plan demonstrated by their stakeholders, I am optimistic that the Plan will be confirmed within 45 days of the Petition Date. Because the Plan provides for payment in full of the Payable Claims and the release of the Preference Actions, the relief requested in the Trade Creditors Motion merely expedites the treatment and distribution to the Prepetition Creditors that they would otherwise be entitled to receive upon consummation of the Plan. This timing difference is, in the Debtors' business judgment, warranted in order to avoid the risk of deteriorating and possibly disrupting relationships with suppliers, vendors, and other essential parties.

83.    Finally, I believe that maintaining current trade terms with the Prepetition Creditors will help the Debtors maintain their liquidity and will facilitate their ability to sustain operations while avoiding the unnecessary expense of finding replacement vendors and suppliers. Such terms allow the Debtors to avoid the inherent operational inefficiencies of paying cash on demand and managing billing processes for numerous vendors that might require cash in advance or shorten their trade terms to less than a week.

### H.    Wages and Benefits Motion

84.    The Debtors seek entry of interim and final orders (i) authorizing the Debtors, in their sole discretion and in the exercise of their business judgment, as deemed necessary to continue to operate and preserve value, and subject to the terms of the Restructuring Support Agreement and the Cash Collateral Order and any budgets approved in connection therewith, to (a) pay all prepetition wages, salaries, other compensation, and related administration and other costs incidental to the foregoing (all as described below and collectively, the "**Compensation Obligations**") and prepetition employee benefits (all as described below and collectively, the "**Employee Benefit Obligations**"), (b) withhold all

federal, state, and local taxes relating to the Compensation Obligations and Employee Benefit Obligations as required by applicable law, (c) pay all employment, unemployment, social security, and similar federal, state, and local taxes relating to the Compensation Obligations and Employee Benefit Obligations, whether withheld from wages or paid directly by the Debtors to governmental authorities (collectively, "**Payroll Taxes**"), and make other payroll deductions, including, but not limited to, retirement and other employee benefit plan contributions, garnishments, and voluntary deductions (all as described below, and collectively with the Payroll Taxes, the "**Payroll Deduction Obligations**" and collectively with the Compensation Obligations and Employee Benefit Obligations, the "**Prepetition Employee Obligations**"), and (d) continue and honor their prepetition programs, policies, and practices with respect to the Prepetition Employee Obligations in the ordinary course of business and (ii) directing all financial institutions to receive, honor, process, and pay any and all checks and wire transfers drawn on the Debtors' accounts in satisfaction of the Prepetition Employee Obligations.  As of the Petition Date, the Debtors estimate that the Prepetition Employee Obligations total no more than $42,800, all of which will become due and owing during the 21 days following the Petition Date (the "**Interim Amount**").

85.    As of the Petition Date, the Debtors employ approximately 91 full-time employees, 42 of which are employed by EPS ("**EPS Employees**") at the Debtors' corporate headquarters in Tampa, Florida and 49 of which are employed by UPEC ("**UPEC Employees**") at the Union Facility.  Currently, the Debtors do not have any part-time employees.

86.    The EPS Employees and UPEC Employees (collectively, the "**Employees**") are co-employees of FBS pursuant to a Service Agreement dated October 25, 2013, between FBS and EPS and a Service Agreement dated October 25, 2012, between FBS

and UPEC.  Pursuant to these service agreements, FBS is required to pay wages and maintain the employee benefits programs for the Employees, which include, among other benefits, health care, flexible spending, life insurance, and long term disability.  Both UPEC and EPS maintain separate payroll accounts, which FBS accesses to pay the Employees' wages and benefits.[11]

87.     The energy, asset, and operations management services for the Union Facility are provided by EPS pursuant to a Management Services Agreement dated June 1, 2005, by and among EPS, Gila River Power L.P. (n/k/a Gila River Power LLC, a non-Debtor), and UPP.  The services provided by EPS, include, among other things, providing, operating, and maintaining the Union Facility, purchasing and replacing spare parts, tools, and equipment, and maintaining financial and operational records.  Additionally, UPEC leases the UPEC Employees to UPP to perform management, administrative, and operating maintenance functions at the Union Facility pursuant to a 10-year Employee Leasing Agreement dated June 1, 2005.

88.     *Wage and Salary Obligations*.  Before the Petition Date and in the ordinary course of business, the Debtors typically paid Compensation Obligations to their Employees on a bi-weekly basis.  The Debtors estimate that their bi-weekly gross payroll is approximately $410,100.

89.     The Debtors engage FBS as a payroll service to transmit payment of the Compensation Obligations to Employees.  The bi-weekly payroll cycle begins on the Monday and ends on the Sunday of each week.  In connection with each payroll cycle, the Debtors pre-fund two payroll accounts at Bank of America and FBS prepares and distributes payments to Employees through either a direct deposit or by issuing a payroll check on the Thursday of each payroll cycle.  The Debtors last pre-funded the payroll accounts on or around July 31, 2014.

---

[11] The payroll accounts are described in greater detail above in the summary of the Cash Management Motion.

90.     As of the Petition Date, the Debtors estimate that they have approximately $27,000 in Compensation Obligations outstanding, all of which will become due and owing during the 21 days following the Petition Date.   There are no Employees that are owed Compensation Obligations that exceed the $12,475 cap established by Bankruptcy Code section 507(a)(4).

91.     *Long Term Incentive Plan for Senior Management*.   Before the Petition Date, the Debtors offered an annual Long Term Incentive Plan (the "**LTIP**") to reward eligible members of senior management (the "**Senior Managers**") for achieving performance objectives. Payments under the LTIP were made upon satisfaction of certain three-year period actual cash targets contained in the LTIP.   The LTIP provided that each Senior Manager received a bonus commensurate with the aggregate amount of actual cash paid to key stakeholders during that particular performance cycle.   As of the Petition Date, thirteen Senior Managers were eligible to participate in the LTIP.   Payments under the LTIP are made in the first payroll in the calendar year.   Given the expected short duration of these cases and the contemplated termination of the LTIP under the Plan, the Debtors do not anticipate making payments under the LTIP during the pendency of these cases, **provided, that** they reserve the right to seek approval to do so at a later date should circumstances warrant (subject to the terms of the Restructuring Support Agreement and the Cash Collateral Order).

92.     *Short Term Incentive Plan for Senior Management*.   Before the Petition Date, the Debtors also offered an annual Short Term Incentive Plan (the "**STIP**") to reward certain Employees for achieving performance objectives.   Payments under the STIP were made upon satisfaction of certain EBITDA targets (65% weighting) and categorical quality targets focused on and supportive of the Debtors' longer term goals and objectives (35% weighting).

The STIP provided that each manager would receive a payout once, among certain other criteria, a particular Management EBITDA (as defined in the STIP) target was achieved for each applicable year. The other portion of the STIP was tied to an employee achieving level of quality that would promote the longer term success of the company. Payments under the STIP are made in the first payroll in the calendar year. Given the expected short duration of these cases and the contemplated termination of the STIP under the Plan, the Debtors do not anticipate making payments under the STIP during the pendency of these cases, **provided, that** they reserve the right to seek approval to do so at a later date should circumstances warrant (subject to the terms of the Restructuring Support Agreement and the Cash Collateral Order).

93. On or promptly following the effective date of the Plan, the Debtors anticipate adopting a new short term incentive plan and a new long term incentive plan for their Employees consistent with the terms set forth in the Incentive Compensation Term Sheet, and the existing LTIP and STIP will be terminated.[12] The Debtors do not anticipate that any claims will arise on account of the termination of the existing plans.

94. *Payroll Taxes.* The Debtors withhold funds from Employees' wages and salaries and also make certain Payroll Tax payments from their own funds. The Debtors' average bi-weekly Payroll Taxes are approximately $23,500. As of the Petition Date, the Debtors estimate that they have approximately $1,700 in accrued Payroll Taxes outstanding, all of which will become due and owing during the 21 days following the Petition Date.

95. *Garnishments*. In the ordinary course of processing payroll checks for their Employees, the Debtors may be required by law, in certain circumstances, to withhold from

---

[12] The Incentive Compensation Term Sheet is attached as Exhibit 5 to the restructuring term sheet attached as Exhibit A to the Restructuring Support Agreement.

certain Employees' wages amounts for various garnishments, such as tax levies, child support, and other court-ordered garnishments (collectively, the "**Garnishments**").    The Debtors withhold amounts from certain Employees' paychecks related to Garnishments, and remit the same to the appropriate governmental authorities on a monthly basis.  As of the Petition Date, I believe that all Garnishments have been remitted to the appropriate governmental authorities.

96.     *Payroll Processing Service Obligations*.  As noted above, FBS provides payroll and other related services to the Debtors for which FBS is paid a bi-weekly administrative fee of 1.1% of gross wages.  As of the Petition Date, the Debtors estimate that they have approximately $4,200 in amounts owed to FBS outstanding on account of payroll services rendered, all of which will become due and owing during the 21 days following the Petition Date.

97.     *Paid Time Off and Severance*.   The Debtors offer certain eligible Employees other forms of compensation including, among other things, vacation and personal days, holidays, civic duties leave, bereavement days, and severance.    These forms of compensation are usual, customary, and necessary if the Debtors are to retain qualified Employees to operate their businesses.  Failure to provide these benefits could harm Employee morale and encourage the premature departure of Employees.  Therefore, the Debtors request authority to continue these programs in the ordinary course of business during these chapter 11 cases.

98.     *Health and Welfare Benefits*.   Prior to the Petition Date, the Debtors offered their eligible Employees various standard employee benefits, which include, without limitation, (i) medical coverage; (ii) dental insurance; (iii) vision; (iv) employee assistance; (v) flexible spending; (vi) life and accidental death and dismemberment insurance; (vii) disability

benefits; and (viii) miscellaneous other benefits provided to Employees in the ordinary course of business (collectively (i)-(viii), the "**Health and Welfare Benefits**").  Employees must work 30 hours or more per week to become eligible for Health and Welfare Benefits.  FBS administers most of the Health and Welfare Benefits provided to Employees pursuant to consolidated plans, programs, and policies.  I understand that the Debtors' average monthly payments on behalf of the Health and Welfare Benefits aggregate approximately $105,270.

99.  *401(k) Plan.*  The Debtors sponsor a retirement investment plan and withhold from the wages of participating Employees contributions toward the Entegra Power Services 401(k) Plan (the "**401(k) Plan**").  To participate, Employees must be at least 21 years old and projected to work more than 1,000 hours per year for the Debtors.  Eligible Employees may make pre-tax or post-tax contributions to the 401(k) Plan ranging from 1% to 90% of their annual compensation, up to the maximum amount allowed by the Internal Revenue Service.  I understand that the Debtors provide a matching contribution of 50% on the first 6% of the eligible Employee's contribution.   Employees become vested in the Debtors' matching contribution in accordance with the following schedule:

| Years of Service | Vested Percentage |
|---|---|
| Less than 1 | 0% |
| 1 or more but less than 2 | 20% |
| 2 or more but less than 3 | 40% |
| 3 or more but less than 4 | 60% |
| 4 or more but less than 5 | 80% |
| 5 or more | 100% |

100.  As of the Petition Date, 40 EPS Employees and 42 UPEC Employees participate in the 401(k) Plan (the "**Participating Employees**").  I understand that on average, the Debtors withhold approximately $40,800 per month from Participating Employees' paychecks on account of the 401(k) Plan that is then forwarded to the administrator of the 401(k)

Plan, Fidelity Management Trust Company ("**Fidelity**").  As of the Petition Date, the Debtors do not believe that they are holding any amounts on account of prepetition withholding obligations pursuant to the 401(k) Plan that have not been forwarded to Fidelity.  I understand that on average, the Debtors' monthly 401(k) Plan matching contributions aggregate approximately $16,000.  As of the Petition Date, the Debtors estimate that they have approximately $8,500 in matching contributions outstanding, all of which will become due and owing during the 21 days following the Petition Date.

101.    The Debtors pay Fidelity all custodial, administrative, and other professional fees related to the operation of the 401(k) Plan in the amount of approximately $1,400 per quarter.  As of the Petition Date, the Debtors estimate that they have approximately $1,400 in amounts owed to Fidelity outstanding on account of the 401(k) Plan, all of which will become due and owing during the 21 days following the Petition Date.

102.    *Reimbursement Obligations*.  Certain Employees incur expenses in the course of performing their jobs, including travel and meal expenses (the "**Business Related Expenses**").  Travel expenses exceeding a certain amount require prior approval from certain members of the Debtors' management.  The Debtors make one corporate credit card available at the Debtors' corporate headquarters and one corporate card available at the Union Facility to procure items such as office supplies.  I understand that the Debtors' average monthly payment on behalf of Business Related Expenses is approximately $36,500.

103.    I believe that any delay or failure to pay wages, salaries, benefits, and other similar items would irreparably impair Employees' morale, dedication, confidence, and cooperation and would adversely impact the Debtors' relationship with their Employees at a time when Employees' support is critical to the success of the Debtors' chapter 11 cases.  The Debtors

simply cannot risk the substantial damage to their businesses that would result from any decline in employee morale.  Consequently, I believe that it is critical that the Debtors be authorized to satisfy their Prepetition Employee Obligations and continue their ordinary course Employee Benefits Obligations in effect as of the Petition Date.

104.    Moreover, if the checks issued and fund transfers requested in payment of the Prepetition Employee Obligations are dishonored, or if such Prepetition Employee Obligations are not timely paid during the postpetition period, the Debtors' Employees could suffer extreme personal hardship, including, in some instances, being unable to pay their daily living expenses.  It would also be inequitable to require the Debtors' employees to bear personally the cost of any business expenses they incurred prepetition, for the benefit of the Debtors, with the understanding that they would be reimbursed.

105.    Accordingly, I believe that payment of all Prepetition Employee Obligations in accordance with the Debtors' prepetition business practices will enable the Debtors to retain qualified employees and is in the best interests of the Debtors, their estates and creditors, and any parties in interest.

## I.    Scheduling and Confirmation Motion

106.    The Debtors seek entry of an order (i) scheduling a combined hearing (the "**Combined Hearing**") to (a) approve the Disclosure Statement, (b) approve the Solicitation Procedures, including the form of Ballot, and (c) consider confirmation of the Plan; (ii) establishing the deadline (the "**Objection Deadline**") to object to the adequacy of the Disclosure Statement and confirmation of the Plan; (iii) approving the form and manner of notice of the Combined Hearing and the Objection Deadline; (iv) conditionally directing the U.S. Trustee not to convene an initial meeting of creditors under Bankruptcy Code section 341 (the "**341 Meeting**"); (v) waiving the requirement that the Debtors file statements of financial

45

affairs ("**SOFA**s") and schedules of assets and liabilities ("**Schedules**") and the first periodic reports of financial information with respect to entities in which the Debtors' estates hold a controlling or substantial interest pursuant to Federal Rule of Bankruptcy Procedure 2015.3(a) (the "**2015.3 Reports**"); and (vi) granting related relief.

107.   Specifically, below is a table highlighting the dates relevant to the Solicitation Procedures and setting forth the Debtors' proposed dates for the mailing of the Combined Notice, the Objection Deadline, and the Combined Hearing.

| Confirmation Timetable | |
| --- | --- |
| Voting Record Date | June 30, 2014 |
| Commencement of Solicitation | July 3, 2014 |
| Voting Deadline | August 4, 2014 at 5:00pm (EDT) |
| Plan/Disclosure Statement Objection Deadline | September 8, 2014 at 5:00pm (EDT) |
| Plan/Disclosure Statement Reply Deadline | September 15, 2014 |
| Combined Hearing | September 18, 2014 |

108.   *Scheduling a Combined Hearing*.   Based on my discussions with the Debtors' advisors, I believe that a Combined Hearing to consider approval of the Disclosure Statement, the Plan, and the Solicitation Procedures is appropriate in these chapter 11 cases. Scheduling the Combined Hearing for September 18, 2014 is consistent with practice for prepackaged cases in this District, applicable statutes, and rules, and will facilitate an expeditious reorganization on a schedule consistent with the dates set forth in the Restructuring Support Agreement.

109.   *Approval of the Disclosure Statement*.   The Disclosure Statement is extensive and comprehensive.   It contains descriptions of, among other things: (i) the Plan; (ii) the operation of the Debtors' businesses; (iii) key events leading to the commencement of these chapter 11 cases; (iv) the Debtors' significant prepetition indebtedness; (v) the proposed

capital structure of the reorganized Debtors; (vi) a liquidation analysis setting for the estimated return that holders of claims and equity interests would receive in a hypothetical chapter 7 liquidation; (vii) financial information and valuations that would be relevant to creditors' determinations of whether to accept or reject the Plan; (viii) risk factors affecting the Plan; and (ix) federal tax law consequences of the Plan. I believe that the Disclosure Statement meets the requirements for "adequate information" under Bankruptcy Code section 1125(a).

110. *Approval of Solicitation Procedures and Forms of Solicitation Materials*. I understand that holders of claims and equity interests in unimpaired classes are conclusively presumed to accept the Plan under Bankruptcy Code section 1126(f) and therefore, were not solicited. I further understand that before the Petition Date, the Debtors began soliciting votes on the Plan by transmitting copies of the Solicitation Package to holders of impaired claims and equity interests via first class mail. The Solicitation Package advised recipients, among other things, of the Voting Deadline, how to return completed Ballots, and the method by which the Voting Agent will tabulate the votes and elections contained in the Ballot. As required by Federal Rule of Bankruptcy Procedure 3017(d), the Ballot is based upon Official Form No. 14, but has been modified to address the particular aspects of these chapter 11 cases and to include additional information that the Debtors believe to be relevant and appropriate for the Voting Classes.

111. I believe that the Debtors' prepetition solicitation falls within at least one of the exceptions from the registration requirements under applicable federal and state securities law, including, without limitation, the private placement exemption provided by section 4(a)(2) of the Securities Act of 1933, or Regulation D or Regulation S promulgated under the Securities Act of 1933, and similar exemptions under applicable state securities laws.

RLF1 10617357v.1

112.    I further believe that the Debtors' prepetition solicitation satisfies Bankruptcy Code section 1126(b)(2) because all holders in classes entitled to vote to accept or reject the Plan received "adequate information" under Bankruptcy Code section 1125(a).  I also believe that the Solicitation Procedures, including the selection of the Voting Deadline, comply with Federal Rule of Bankruptcy Procedure 3018, as the Solicitation Package was distributed to all holders of claims and equity interests entitled to vote to accept or reject the Plan and that such holders had adequate time to consider the materials in the Solicitation Package.

113.    *Establishing the Objection Deadline*.  I believe the proposed Objection Deadline of September 8, 2014 at 5:00pm (prevailing Eastern Time), provides creditors and equity holders with sufficient notice of the deadline for filing objections to the Disclosure Statement and the Plan, while still affording the Debtors and any parties in interest time to file a responsive brief and resolve consensually as many of those objections as possible.  Further, significant majorities of the Debtors' key stakeholders agreed to support the restructuring and vote to accept the Plan pursuant to the Restructuring Support Agreement.  As a result, and due to the fact that many classes of claims and equity interests are unimpaired, I do not expect objections to the Disclosure Statement or the Plan.  However, I believe the proposed period of time within which to object to the Disclosure Statement or the Plan will provide any parties in interest with ample time to file objections, if they wish to do so.  I also believe that the proposed form and manner for distributing notice of the Combined Notice, the Objection Deadline, and commencement of these chapter 11 cases, via mail and publication, provide adequate notice to any parties in interest.

114.  *Extension and Conditional Waiver of 341 Meeting, Filing of SOFAs and Schedules, and Filing of 2015.3 Reports*.  I believe that the extension and conditional waiver of the requirements of a 341 Meeting, filing of SOFAs and Schedules, and filing of 2015.3 Reports is appropriate under the circumstances, as the Debtors anticipate the near-term confirmation of the Plan and subsequent emergence from chapter 11, with all holders of Allowed General Unsecured Claims (as defined in the Plan) paid in full, in cash.  Granting this relief conditionally at the outset of these chapter 11 cases also allows the U.S. Trustee to schedule a 341 Meeting, if it eventually becomes appropriate to do so.  Preparation and filing of the SOFAs and Schedules and 2015.3 Reports would require the Debtors to expend considerable time and resources, which expenses would have been unnecessary if the Debtors are able to confirm the Plan on their intended timetable and are ultimately excused from filing the SOFAs and Schedules and 2015.3 Reports.  Further, much of the information required to be disclosed in the 2015.3 Reports is reflected in the Disclosure Statement and duplicative of information already available to parties in interest.  As such, this requirement would require significant time and energy without providing additional information of material value.  I believe that it will not cause any harm to any parties in interest to either conditionally waive the requirements of a 341 Meeting, the filing of SOFAs and Schedules, and the filing of 2015.3 Reports or extend the deadline for each to October 15, 2014, should the Plan not be confirmed prior to that time.

**J.      Cash Collateral Motion**

115.  The Debtors seek entry of interim and final orders (the "**Cash Collateral Order**") (i) authorizing the Debtors to use Cash Collateral; (ii) granting adequate protection to Prepetition Secured Parties; (iii) scheduling a final hearing pursuant to Federal Rule of Bankruptcy Procedure 4001(b); and (iv) granting related relief.  The Debtors have set forth the

material terms of the interim Cash Collateral Order in compliance with the Local Rules in the Cash Collateral Motion.

116.    The Debtors' only source of liquidity is the income generated by their business operations.  I believe that substantially all of this cash constitutes the Cash Collateral of holders of the Debtors' Prepetition Second Lien Debt and Prepetition Third Lien Debt.   To continue their operations and preserve the value of their estates on a going-forward basis, the Debtors have an immediate and critical need to use Cash Collateral to procure goods and services from vendors, to pay their employees, and to satisfy other working capital needs.  The Debtors seek to use Cash Collateral for these purposes, all in accordance with the budget attached to the Cash Collateral Motion, with the understanding that the initial budget will extend no further than the first business day that is 45 days from the Petition Date.

117.    The use of Cash Collateral is essential to the Debtors' ability to continue operating their businesses during the pendency of these chapter 11 cases.  Absent the Debtors' use of Cash Collateral, the Debtors will be effectively unable to generate revenue, operate their businesses, or pay the individuals who report to work each day.  In the absence of the use of Cash Collateral, the continued operation of the Debtors' businesses would not be possible, and I believe that immediate and irreparable harm to the Debtors and their estates would occur.

RLF1 10617357v.1

## **CONCLUSION**

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing

is true and correct to the best of my knowledge and belief.


Dated:      August 4, 2014
            Tampa, Florida

                                        /s/ *Michael R. Schuyler*
                                        Michael R. Schuyler
                                        President and CEO
                                        Entegra Power Group LLC, *et al.*

RLF1 10617357v.1

**Exhibit A**

**Organizational Chart**

# Entegra Power Group LLC

